**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>**FOR PUBLICATION**</u>

---------------------------------------------------------------x

In re:                                                   Chapter 11

ARCAPITA BANK B.S.C.(c), *et al.*,                       Case No. 12-11076 (SHL)

                                                         (Confirmed)


                    Reorganized Debtors.
---------------------------------------------------------------x
KHALID AHMED A. BAESHEN, OSAMA
AHMED A. BAESHEN, SAHAR AHMED A.
BAESHEN, and SUMAYYA AHMED A.
BAESHEN,

                    Plaintiffs,

                                                         Adv. Pro. No. 13-01677 (SHL)
          vs.

ARCAPITA BANK B.S.C.(c), ARCAPITA
INVESTMENT HOLDINGS LIMITED,
ARCAPITA LT HOLDINGS LIMITED,
WINDTURBINE HOLDINGS LIMITED,
AEID II HOLDINGS LIMITED, and
RAILINVEST HOLDINGS LIMITED,

                    Defendants.
---------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

MILBANK, TWEED, HADLEY & MCCLOY, LLP
*Counsel for the Reorganized Debtors and the New Holding Companies*
One Chase Manhattan Plaza
New York, NY 10005
  By:  Dennis F. Dunne, Esq.
       Evan R. Fleck, Esq.
       Lena Mandel, Esq.


       -and-

1850 K Street, N.W., Suite 1100
Washington, D.C. 20006
  By:  Andrew M. Leblanc, Esq.

BAKER & HOSTETLER LLP
*Counsel for Khalid Ahmed A. Baeshen, Osama Ahmed A. Baeshen,*
*Sahar Ahmed A. Baeshen, and Sumayya Ahmed A. Baeshen*
45 Rockefeller Plaza
New York, NY 10111
  By:  Regina L. Griffin, Esq.
         Marc Skapof, Esq.
         James W. Day, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion (the "Motion") by the above-referenced reorganized

debtors (the "Debtors" or "Arcapita"), seeking to dismiss the Plaintiffs' complaint (the

"Complaint") in the above-captioned adversary proceeding.  The Complaint alleges that

certain funds in the possession of the Debtors are not property of the estate, but rather

belong to the Plaintiffs.  The Debtors allege that the Plaintiffs' Complaint is precluded

under the doctrine of *res judicata* because the classification and treatment of the

Plaintiffs' monetary claims against the Debtors were conclusively determined in the

confirmation order entered in this case in June 2013 [ECF No. 1262] (the "Confirmation

Order").  For the reasons stated below, the Court agrees with the Debtors and dismisses

the Complaint as an impermissible attempt to collaterally attack the Confirmation Order.

## BACKGROUND

Founded in 1996, Arcapita was an alternative investment vehicle and investment

bank offering Shari'ah-compliant investment opportunities.[1]  Compl. ¶ 26.  Its

headquarters were located in Bahrain.  Compl. ¶ 28.  The Plaintiffs entered into an

investment account agreement with Arcapita, placing a total of $10,262,957.36 for

---

[1]     "Shari'ah, in its most basic sense, is the bedrock of Islamic jurisprudence. . . . [T]he Central Bank of Bahrain, the Defendants' chief regulator, expressly differentiates between what it calls 'Conventional Banks' and 'Islamic Banks.'  Bahraini law requires transactions with Islamic Banks, such as Arcapita, to be governed by Islamic Shari'ah principles."  Compl. ¶ 26.

investment purposes in four bank accounts at Arcapita (collectively, the "Mudarib Accounts"). Compl. ¶¶ 2-3, 8. Of this total amount, $3,012,223.55 was never invested by Arcapita and remained in the Mudarib Accounts (the "Undeployed Placement"). Compl. ¶ 31. The Mudarib Accounts were governed by two agreements between the Plaintiffs and Arcapita: (1) the First Islamic Application and Agreement for the Opening of an Investment Account; and (2) the Arcapita Application and Agreement for the Opening of an Investment Account (together, the "IA Agreements"). Compl. ¶ 3. According to the IA Agreements, the relationship between the Plaintiffs and Arcapita was governed by Bahraini law. Compl. ¶ 4.

The IA Agreements set forth the general conditions governing these investment accounts with Arcapita. Compl. Ex. A-B. Pursuant to the IA Agreements, Arcapita was appointed by the Plaintiffs to act as Mudarib—an investment manager—with respect to the funds in the Mudarib Accounts. Compl. ¶ 5, Ex. A-B. Under this arrangement, an investor retained title to its investments unless or until the funds were invested in or with third parties. Compl. ¶ 7. The IA Agreements provided that investors could retrieve balances, or parts thereof, upon written notice. Compl. Ex. A-B. The IA Agreements also provided that Arcapita would receive 0.50% per annum of profits earned from investing cash balances in the Mudarib Accounts. Compl. Ex. B.

In December 2010, Arcapita commenced a Rights Offering to its shareholders, including the Plaintiffs, which offered each investor the opportunity to purchase up to 1,666,667 shares in Arcapita, potentially providing a total capital infusion of $500 million. Compl. ¶ 39, Ex. C. If the Rights Offering failed, shareholders would be notified and any affected subscription amounts, together with any profits, would be credited to the shareholders' investment accounts. Compl. ¶ 46, Ex. C. The Plaintiffs

participated and placed $462,568.00 with Arcapita (the "Rights Offering Investment"). Compl. ¶ 40. As it turned out, the Rights Offering was ultimately unsuccessful and thus no shares were issued to subscribing shareholders, including the Plaintiffs. Compl. ¶¶ 42-43.

Arcapita and its affiliated the Debtors filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code in early 2012. Compl. ¶ 55.[2] In late August 2012, the Plaintiffs filed four proofs of claim that were designated as claim numbers 376, 377, 378 and 379 (the "Claims"). Compl. ¶ 58. The Claims sought payment in the total sum of $10,262,597.36, which constituted the aggregate amount that the Plaintiffs had invested in the Mudarib Accounts, including the Undeployed Placement and the Rights Offering Investment.[3] Compl. ¶ 58. In early February 2013, the Debtors filed the first Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code (the "First Plan") and the Disclosure Statement in Support of the Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code (the "First Disclosure Statement"). Compl. ¶ 61.

The First Disclosure Statement explained how the claims of Arcapita investors were addressed in the Plan:

---

[2]      The Plaintiffs requested, and received, notice in these bankruptcy proceedings. The Annex to the Proofs of Claim filed by the Plaintiffs, dated August 15, 2012, requested that copies of all notices with respect to the Plaintiffs' claims be sent to counsel, Cadwalader, Wickersham & Taft LLP. *See, e.g.*, Annex to Proof of Claim Held by Osama Ahmed A. Baeshen, dated August 15, 2012. On October 15, 2013, the Plaintiffs' counsel filed notices of appearance in the bankruptcy case. *See Notice of Appearance and Request for Service of Notices and Document*s [ECF Nos. 1632-33].

[3]      On April 26, 2013, the Debtors objected to parts of the Claims. Compl. ¶ 65. The objection challenged the part of the Claims for money that Arcapita had invested, as of the Petition Date, in the equity of non-Debtor third parties. *See* Debtors' Second Omnibus Objection to Claims [ECF No. 1050] at ¶¶ 13-23 & Schedule 1. The objection also challenged the amount sought for the Undeployed Placement, with the Debtors arguing that their books and records showed a smaller balance than requested by the Plaintiffs. The Debtors' objections to the Claims were never litigated, perhaps because of the filing of this adversary proceeding.

4

> The Plan contemplates that a third-party investor's
> [Unrestricted Investment Account] position, RIA position
> and/or Murabaha position with Arcapita at the Petition Date
> gives rise to general unsecured claims against Arcapita
> Bank (the "*Investor Claims*"). . . .The Investor Claims are
> classified in Class 5(a).[4]

First Disclosure Statement at 39.  The Plaintiffs' share of this class—essentially, the

Plaintiffs' Undeployed Placement—was approximately $3,012,223.55.  Under the First

Plan, therefore, $3,012,223.55 of the Plaintiffs' Claims was classified as a general

unsecured claim.  First Plan, at 5.

The First Disclosure Statement further disclosed that, "[t]he rights of the Rights

Offering Participants to receive the Arcapita Bank Shares contemplated by the Rights

Offering give rise to Subordinated Claims against Arcapita Bank . . . ."  First Disclosure

Statement, at 40.  "The Rights Offering Claims are classified in Class 8(a)."  *Id.*  The

Plaintiffs' claims relating to the Rights Offering—their Rights Offering Investment—

totaled $452,568.00.  Under the First Plan, therefore, $452,568.00 of the Plaintiffs'

Claims was treated as a subordinated claim, meaning that such claims were subordinated

in priority to all claims that were senior or equal to the claim.  First Plan, at 7.

In late April 2013, the Debtors filed the Second Amended Joint Plan of

Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the

---

[4]     While the Complaint does not use the term "Unrestricted Investment Account," the Debtors'
papers explain that the Plaintiffs initial investment went to an Unrestricted Investment Account ("URIA").
The Debtors further explain that

> pending investment by Arcapita Bank or withdrawal by the investor, the URIA funds of
> all investors were commingled and converted into an interest in a mudaraba account.
> When funds were invested in a deal company, a portion of the investor's interest in the
> mudaraba account in the amount of the desired investment was converted into the equity
> interest of such deal company.

Mot. to Dismiss ¶¶ 5-7; *see* Compl. ¶¶5-7 (explaining mudarabah arrangement between the Plaintiffs and
Arcapita).  Thus, the Debtors' description of how the Plaintiffs' investment in Arcapita was managed is
consistent with the allegations in the Complaint.  *Id.* ¶¶ 3-10; 30-38.

Bankruptcy Code (the "Second Plan") and the Second Amended Disclosure Statement in Support of the Second Amended Joint Plan of Reorganization of Arcapita Bank B.S.C.(c) and Related Debtors Under Chapter 11 of the Bankruptcy Code (the "Second Disclosure Statement"). The treatment of the Plaintiffs' claims remained the same. Compl. ¶ 63. Pursuant to the Second Plan, therefore, Class 5(a) claims remained classified as general unsecured claims and Class 8(a) claims against Arcapita remained classified as subordinated claims. Second Plan, at 6-7.

Another party with unspent funds in a Mudarib Account filed a limited objection to the Second Plan on May 30, 2013. Compl. ¶ 66. That party, Mounzer Nasr, was unrelated to the Plaintiffs here. Mr. Nasr's objection argued that money in his account that was held in trust by the Debtors was not property of the Debtors' estates. *Id*. To resolve the objection of Mr. Nasr, the Debtors included a carve-out in the Confirmation Order. That carve-out reserved Mr. Nasr's right to argue that any property held by the Debtors or Reorganized Debtors was not property of the Debtors' estates, and Mr. Nasr retained his right to pursue remedies in connection with this argument. *See* Confirmation Order ¶ 65. While the Plaintiffs did not join in Mr. Nasr's objection, they did actively participate in these bankruptcy cases by joining in an objection to the Debtors' request for replacement postpetition financing, an issue that was scheduled for hearing one day prior to the hearing on confirmation of the Plan.[5] The Plaintiffs' objection was overruled.

On June 17, 2013, the Court entered the Confirmation Order. Compl. ¶ 68. On September 17, 2013, the Plan became effective. Compl. ¶ 70.

---

[5]    The Plaintiffs filed the *Joinder of Khalid Baeshen, Osama Baeshen, Sahar Baeshen and Sumayya Baeshen in the Second Objection of Captain Hani Alsohaibi to the Motion of First Islamic Investment Bank B.S.C.(c) n/k/a Arcapita Bank B.S.C.(c) and its Fellow Debtors for Authority to Obtain Replacement Financing from Goldman Sachs to Repay Existing Financing and in the Accompanying Request that the Hearing Scheduled for June 24, 2013 Concerning Approval of the Proposed Financing Be Adjourned and an Independent Shari'ah Board Be Appointed*, dated June 17, 2013 [ECF No. 1263].

Almost five months after confirmation and two months after the Plan went effective, the Plaintiffs filed the Complaint in this case. The Complaint asserts that, under Bahraini law, the Debtors never held a legal or equitable interest in the Plaintiffs' Undeployed Placement and the Rights Offering Investment that totaled approximately $3,464,791.66 (the "Funds"), and therefore, the Funds were never property of the estate for purposes of Section 541 of the Bankruptcy Code. Compl. ¶ 1. The Plaintiffs' Complaint seeks a judgment: (1) declaring that the Funds are not property of the Debtors' estates and never vested with the reorganized debtors; (2) compelling the reorganized debtors to turn over the Funds; and (3) awarding the Plaintiffs prejudgment interest. Compl. ¶ 15.

## DISCUSSION

In analyzing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court looks to whether a plaintiff has pleaded "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As is the case with any motion to dismiss, the Court accepts the allegations in the Complaint as true. *See id.* at 555.

### A. **The Legal Effect of the Confirmation Order**

A bankruptcy court's "order of confirmation is treated as a final judgment with *res judicata* effect." *In re Indesco Int'l, Inc.*, 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006). The doctrine of *res judicata* generally provides that parties cannot relitigate issues that have previously been decided by a court of competent jurisdiction. Thus, "any attempt by the parties or those in privity with them to relitigate any of the matters that were raised *or could have been raised therein* is barred under the doctrine of *res judicata*." *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (emphasis in

original) (citations omitted).  Courts have considered "[t]he confirmation of a plan in a

Chapter 11 proceeding [to be] an event comparable to the entry of a final judgment in an

ordinary civil litigation."  *Silverman v. Tracar, S.A. (In re Am. Preferred Prescription,*

*Inc.)*, 255 F.3d 87, 92 (2d Cir. 2001); *see also Browning v. Levy*, 283 F.3d 761, 772 (6th

Cir. 2002) (finding as a general rule "the '[c]onfirmation of a plan of reorganization

constitutes a final judgment in bankruptcy proceedings.'") (alterations in original)

(citations omitted).  The preclusive effect of a confirmation order is limited "by the

content of the reorganization plan and the confirmation order."  *Maxwell Commc'n.*

*Corp. v. Societe Generale (In re Maxwell Commc'n. Corp.)*, 93 F.3d 1036, 1044-45 (2d

Cir. 1996).

        Under Section 1141 of the Bankruptcy Code, a confirmation plan "bind[s] its

debtors and creditors as to *all* the plan's provisions, and all related, property or non-

property based claims which could have been litigated in the same cause of action."

*Sure-Snap*, 948 F.2d at 873 (emphasis in original).  If a party had adequate information

about prospective claims prior to the commencement of a bankruptcy proceeding, that is

evidence it could have brought the action in the first instance.  *See id.*

        However, "*[r]es judicata* does not apply when a cause of action has been

expressly reserved for later adjudication."  *Eastern Air Lines, Inc. v. Brown &*

*Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.)*, 262 B.R. 604, 612 (Bankr.

S.D.N.Y. 2001) (citation omitted).  For example, a debtor's claim will not be precluded if

the debtor has "sufficiently identified and reserved its contingent claims against the

[creditors] in the Stipulation, its Disclosure Statement, Plan and the Confirmation Order. .

. ."  *Id.* at 613.  Claims holders are given the opportunity to object to the confirmation

order only after Chapter 11 petitioners are required to file a "disclosure statement listing

all 'adequate information' which would enable holders of claims to take an informed position on a proposed plan." *Sure-Snap*, 948 F.2d at 873. Therefore, *res judicata* operates to preclude parties from "raising claims that they could have . . . but failed to raise before confirmation." *In re Indesco*, 354 B.R. at 664; *see also In re Northwestern Corp.*, 2005 WL 2847228, at *5 (Bankr. D. Del. Oct. 25, 2005).

Under Section 541 of the Code, a debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). "[E]xcept as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." 11 U.S.C. § 1141(c). All documents relating to a confirmation order are part of the plan and should be considered in interpreting a plan's provisions. *See In re Worldcom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006) (considering plan and supplement to debtors' disclosure statement together "to ascertain the meaning of Plan provisions"). Together the plan and disclosure statement constitute a binding contract among the parties. *See, e.g., CGO Invs., LLC v. AB Liquidating Corp. (In re AB Liquidating Corp.)*, 2006 WL 6810956, at *3 (B.A.P. 9th Cir. Dec. 22, 2006) (concluding "[g]enerally a chapter 11 plan should be interpreted as a contract"); *In re Northwestern*, 2005 WL 2847228, at *5.

To determine whether *res judicata* bars a subsequent proceeding, a court will consider "whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 88 (2d Cir. 1997) (citation omitted). Additionally, a bankruptcy court will ask whether "an

independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." *Id.* (citing *Sure-Snap*, 948 F.2d at 875–76).

"Generally *res judicata* is an affirmative defense to be pleaded in the defendant's answer." *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (citing Fed. R. Civ. P. 8(c)). "However, when all relevant facts are shown by the court's own records, of which the court takes notice, the defense may be upheld on a Rule 12(b)(6) motion without requiring an answer." *Id.* (citation omitted). "Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises claim preclusion . . . and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

### B.  The Plaintiffs' Claims Are Barred by the Confirmation Order

The Debtors' Motion argues that the Plaintiffs seek to collaterally attack the Confirmation Order's treatment of the Plaintiffs' claims. The Plaintiffs counter by arguing that the Confirmation Order does not bar their claims under the doctrine of *res judicata*. The parties do not dispute that the second and third elements of *res judicata* are satisfied as the litigants are the same parties and this Court was of competent jurisdiction. *See* Mot. to Dismiss at 8-10 [ECF No. 4]; Memo. of Law in Opp. to Mot. to Dismiss at 11-12 [ECF No. 10]. The parties instead dispute whether the first and forth elements are satisfied.

Turning to the first element, the Plaintiffs argue the Confirmation Order is not a final judgment on the merits because a plan confirmation cannot confer upon a debtor title to another's property. *See* Plaintiffs' Opp. at 11. But the Court disagrees with the Plaintiffs' framing of the issue. While it is true that a party has the right to contest what

10

constitutes property of the estate, this issue was resolved in the plan of reorganization that

was approved by the Confirmation Order.  This is hardly surprising, given that an

understanding of what constitutes property of the estate is central to determining the

distribution to creditors in any plan of reorganization.  *See, e.g., In re MF Global Inc.*,

478 B.R. 611, 618 (Bankr. S.D.N.Y. 2012) ("Section 1123(a)(5) provides a means for the

estate to transfer property as part of a confirmed plan, requiring that a plan of

reorganization provide adequate means for implementation, including the 'transfer of all

or any part of the property of the estate to one or more entities . . . .'")  (quoting 11

U.S.C. § 1123(a)(5)(B)); *In re Loco Realty Corp.*, 2009 Bankr. LEXIS 1724, at *14

(Bankr. S.D.N.Y. June 25, 2009) (determining whether rental income constituted

"property of the estate, such that the Debtor can use [it] to fund its proposed plan of

reorganization."); *Enron Power Mktg., Inc. v. Nev. Power Co. (In re Enron Corp.)*, 2005

Bankr. LEXIS 3024, at *7 (Bankr. S.D.N.Y. Jan. 4, 2005) ("[I]t is important that property

of the estate that is protected prior to confirmation of the Plan or its effective date should

be protected after confirmation or effective date. Therefore, this Court used its power

under [S]ection 105 to enjoin continuation of the FERC Hearing, as the Court determined

that EPMI's rights under the WSPP Agreement are property of the estate and remain

important to effectuating the Plan. This is because the Plan contemplates distribution of

all of the assets of the Debtors.").

  The Plaintiffs' interests in the Funds were clearly delineated as claims under the

Debtors' plan.  The First Disclosure Statement classified the Plaintiffs' claims relating to

the Undeployed Placement in the Mudarib Accounts as Class 5(a) claims, and the claims

related to the Rights Offering Investment as Class 8(a) claims.  First Disclosure

Statement at 39-40.  Under the First Plan, Class 5(a) claims were classified as general

unsecured claims and Class 8(a) claims were classified as subordinated claims.  First Plan at 5, 7.  The Second Plan did not change the treatment of these claims.  Second Plan at 6-7.  *See In re Indesco Int'l, Inc.*, 354 B.R. at 665 (finding claimants were barred by *res judicata* from claiming, post-confirmation, that treatment of their claims under the Plan was discriminatory).[6]

The Plaintiffs do not assert that they did not have adequate notice of the confirmation hearing or the proposed plans of reorganization.  Thus, the Plaintiffs had adequate notice about the specific classification and treatment of its claims.  Confirmation Order ¶ I; Confirmation Order Exhibit B.  Nor do the Plaintiffs raise any issues with the way the confirmation hearing was conducted.  Nor have Plaintiffs explained why they did not raise this claim prior to plan confirmation.[7]

---

[6]    Additionally, the Second Plan defined "assets" as: "all property wherever located in which any of the Debtors holds a legal or equitable interest, including all property described in Section 541 of the Code and *all property disclosed in the Debtors' respective Schedules and the Disclosure Statement*."  Second Plan, Appendix A, ¶ 22 (emphasis added).  Arcapita Bank's Schedule B-Personal Property, disclosed over $147 million in its deposit and current accounts (including a Shari'ah compliant profit sharing account) in which the Funds had been commingled.  *See* Schedule B, Rider B-2 [ECF No. 212].  The Disclosure Statement also provided that the Debtors' remaining cash balance—which would naturally include the remaining cash in these accounts—would be used by the Reorganized Debtors to fund plan distributions and post-effective date operations.  *See* Exhibit C to the First Amended Disclosure Statement (Projections) at 4 [ECF No. 983].  The money at issue in this Complaint—the Undeployed Placement and the Rights Offering Investment—was disclosed in both the Schedules and the Disclosure Statement, and therefore, according to the Plan, fit squarely into the definition of "assets."  Thus, the Funds were characterized as part of the Debtors' estate from the very beginning of the bankruptcy case.  This characterization was never challenged by the Plaintiffs.  *See In re Ionosphere Clubs, Inc.*, 262 B.R. at 612 (*res judicata* precludes claims that "*could* and should have been brought in the earlier litigation.") (emphasis in original).

[7]    Indeed, the Disclosure Statement noted that another party,

QRE Investments W.L.L., an entity with a $196 million general unsecured claim arising from the placement of proceeds from the sale of joint venture shares in an Arcapita Bank account "should receive payment in full" after considering "the potential argument that the Sale Proceeds are not property of the Arcapita Bank estate."  According to the Debtors, the Arcapita Bank account in which these proceeds were deposited—like the Mudarib Accounts— was callable by the depositor at any time.

Compl. ¶ 64.  It is unclear whether the circumstances of QRE Investments W.L.L. are truly analogous to those of the Plaintiffs.  Nonetheless, this statement clearly put the Plaintiffs on notice well in advance of confirmation of the issues raised in their Complaint.

In arguing that the Plan did not confer title upon the Debtors, the Plaintiffs rely on cases that are distinguishable.  *See* Plaintiffs' Opp. to Mot. to Dismiss at 5-6 (citing *In re Toney*, 349 B.R. 516 (E.D. Tenn. 2006); *Rutherford Hospital Inc. v. RNH Partnership*, 168 F.3d 693 (4th Cir. 1999); *Winters Nat. Bank and Trust Co. of Dayton v. Simpson (In re Simpson)*, 26 B.R. 351 (Bankr. S.D. Ohio 1982); *Estep v. Fifth Third Bank of N.W. Ohio (In re Estep)*, 173 B.R. 126 (Bankr. N.D. Ohio 1994); *Gould v. Smith (In re Holywell Corp.)*, 118 B.R. 876 (S.D. Fla. 1990)).  All of these cases addressed far different circumstances.  In *In re Toney*, for example, a foreclosure sale of the debtor's residence took place prior to the debtor filing for Chapter 13 bankruptcy relief.  *In re Toney*, 349 B.R. at 518.  The bankruptcy court in *Toney* concluded the foreclosure sale divested the debtor of his interest in the property and rejected the debtor's argument that the confirmed Chapter 13 reinstated the mortgage and gave him back his residence.  *Id.* Similarly, in *In re Simpson*, the debtor attempted to reinstate her ownership interest in property that was sold at a foreclosure sale by virtue of the confirmed plan.  *In re Simpson*, 26 B.R. at 352-53.  The debtors in *Toney* and *Simpson* were lawfully divested of their title to the property by a foreclosure sale and the bankruptcy process did not provide for a reinstatement of the debtor's rights by collateral attack.  The Plaintiffs' reliance on *Rutherford Hospital* is also misplaced because *Rutherford* did not deal with a plan or confirmation order.  Moreover, the property that the plaintiff in *Rutherford* claimed to own was not even in existence at the time of the bankruptcy sale.  *Rutherford*, 168 F.3d at 699.

The lack of authority supporting the Plaintiffs' position is not surprising given the real world consequences of permitting the Plaintiffs' legal challenge.  In short, it would wreak havoc.  The Plaintiffs' Complaint challenges a central premise of the Debtors'

confirmed plan: that approximately $320 million of Mudarib Funds are available for distribution to claimants on a pro rata basis under the classification scheme set forth in the Plan.[8]

Indeed, given concerns about the finality of a confirmed plan, it is well established that a confirmation order may be revoked only if it was procured by fraud. 11 U.S.C. §1144. But the Plaintiffs do not allege any claim of fraud. Rather, the facts demonstrate that the Plaintiffs were aware the treatment that the Funds would receive under the Plan. A party cannot "attack[] a chapter 11 confirmation order by characterizing [its] action as an independent motion or cause of action . . . ." *In re BGI Inc.*, 2012 WL 5392208, at *4 (Bankr. S.D.N.Y. Nov. 2, 2012). To determine whether a party is attempting to revoke a confirmation order, a court considers "whether the relief sought would upset the confirmed plan, [and] negatively affect innocent parties and creditors . . . ." *Id.* Much like the circumstances before this Court, the court in *BGI* found that allowing claimants in that case to receive their requested relief would result in a class of individuals filing untimely claims, resulting in a redistribution of estate assets—essentially revoking the confirmation order. *Id.* at *4. Of course, "[w]here a claim does not involve an attempt to 'redivide the pie' by a disgruntled participant in the Plan . . ." and instead "involves a dispute about an additional asset that did not figure into the reorganization [p]lan . . ." adjudication of the claim may be permitted. *Farley v. Coffee Cupboard, Inc. (In re Coffee Cupboard, Inc.)*, 119 B.R. 14, 19 (E.D.N.Y. 1990). But the Plaintiffs' claims here do not involve "additional asset[s] . . . not figure[d] into

---

[8]    According to the plan documents on file in these cases, third party investors' undeployed positions with Arcapita constitute approximately $320 million in cash in an estate whose total value as of June 2013 was estimated at approximately $1.3 billion. *See* Debtors' Reply ¶ 2 (citing Plan Supplement Annex 25 (Projections (updated)). [ECF No. 1195-25].

the reorganization Plan[.]"  *Id.*  Rather, the Plan made clear how these claims were to be addressed.  Thus, the Plaintiffs' Complaint is an improper attempt to "redivide the pie," because granting the requested relief would dramatically increase the Plaintiffs' payout under the Plan and significantly lessen the sum available for all other claimants.

The Plaintiffs try to avoid the *res judicata* treatment of the Plan by pointing to several provisions of the Plan that purportedly reserve this Court's post-confirmation jurisdiction over certain issues.  The Plaintiffs argue that these provisions specifically contemplate post-confirmation adjudication of disputes regarding whether particular assets are property of the estate.[9]  But all of the provisions cited by the Plaintiffs are generic clauses, none of which specifically address the treatment of the Funds in question.  Under well-established contract principles, the specific language of the Plan relating to the treatment of the Plaintiffs' claims trumps the general language contained in the reservations of this Court's jurisdiction.  *See  Silverman v. Central Equities Credit Corp., (In re 18th Ave. Realty, Inc.)*, 2010 Bankr. LEXIS 1553, at *15 (Bankr. S.D.N.Y. May 7, 2010) ("In construing a chapter 11 plan . . . the Court should apply contract principles.") (citing *In re Shenango Group, Inc.*, 501 F.3d 338, 344 (3d Cir. 2007)).  Indeed, a basic principal on contract interpretation under New York law is that specific

---

[9]       The Plaintiffs rely on three general clauses in the Plan.  The first is Paragraph 11.1.17 of the Plan, which states that the Court retains jurisdiction to "hear and determine all matters related to (i) the property of the Debtors and the Estates from and after the Confirmation Date, including, without limitation, any dispute as to (a) whether property (including any insurance policies and/or the proceeds thereof) is property of the Estate or (b) turnover of property of the Estates, in accordance with sections 541, 542, and 543 of the Bankruptcy Code . . . ."  The second is Paragraph 11.1.6, which states that the Court retains jurisdiction to "adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code. . . ."  The third is Section 7.5 of the Plan, which states that "[e]xcept as expressly provided herein or the Implementation Memorandum, the Assets of each Debtor's Estate shall revest in the applicable Reorganized Debtor on the Effective Date.  *The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan*." (emphasis added).

terms in a contract will override the general.[10]  *See Bowmer v. Bowmer*, 50 N.Y.2d 288, 294 (1980); *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."); *Restatement (Second) of Contracts* § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . . specific terms and exact terms are given greater weight than general language.").

When general and specific provisions of a contract are inconsistent, moreover, "the specific provision controls."  *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956); *Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3 (2009) (stating that if contractual provisions are irreconcilable, "the more specific clause controls the more general") (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:15 (4th ed. 1999 & Supp. 2010)); 11 Williston & Lord, *supra*, § 32.10 ("Where general and specific clauses conflict, the specific clause governs the meaning of the contract. . . ."); 5 Margaret N. Kniffin, Corbin on Contracts § 24.23 (Rev. ed. 1998) ("If the apparent inconsistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage, the more specific term should usually be held to prevail over the more general term."); *see also Barclays Bank PLC v. Giddens (In re Lehman Bros. Holdings Inc.*, 761 F.3d 303, 313 (2d Cir. 2014) ("To the extent that there appears to be conflict between these provisions, the specific governs the general.")

---

[10]    Both the Plan and the Confirmation Order provide that it is to be "governed by, and construed and enforced in accordance with, the laws of the State of New York . . ." , and the Court therefore looks to New York law in interpreting the language of the Plan.  Confirmation Order ¶ 85; Plan § 12.9.

The Plaintiffs' Complaint also is barred because they failed to "expressly reserve" their cause of action. *See In re Ionosphere Clubs, Inc.*, 262 B.R. at 612. The Plaintiffs rely upon the fact that another claim holder, Mounzer Nasr, reserved his rights on the same issues the Plaintiffs now raise. Confirmation Order ¶¶ 64-65. As a result of Mr. Nasr's objection to confirmation (the "Nasr Objection"), the Confirmation Order reserved Mr. Nasr's right to argue "that any property held by the Debtors . . . is not property of the Debtors' estate . . . ." Confirmation Order ¶ 65. As there is no similar provision referring to the Plaintiffs, however, the Plaintiffs failed to reserve the issue and cannot raise it now. *In re AB Liquidating Corp.*, 2006 WL 6810956, at *4 ("[i]f a creditor fails to protect its interests by timely objecting to a plan or appealing the confirmation order, it cannot later challenge the provisions of the confirmed plan, even if such provisions arguably are inconsistent with the Code.") (citation omitted).[11]

The Plaintiffs contend that they are allowed to bring this cause of action despite not reserving their objection at confirmation. To support of this contention, the Plaintiffs rely on *In re Maxwell Commc'n. Corp.*, 93 F.3d 1036 (2d Cir. 1996). But *Maxwell* is easily distinguishable. At issue in *Maxwell* was whether litigation regarding pre-petition transfers by the debtor to certain banks, including Barclay's Bank, should be governed by United States bankruptcy law before an American bankruptcy court or should proceed overseas. Concluding that the doctrine of international comity supported deferring to the courts and laws of England, the Second Circuit affirmed the dismissal of adversary

---

[11]    This is true even if the Plan provisions were objectionable. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (affirming denial of Rule 60(b)(4) motion for Chapter 13 confirmation order discharging student loan interest, despite failure to find undue hardship, and noting that "the order remains enforceable and binding on United because United had notice of the error and failed to object or timely appeal. . . Rule 60(b)(4) does not provide a license for litigants to sleep on their rights.").

proceedings in the United States filed by the Chapter 11 debtor.  Along the way, the

Second Circuit rejected the argument that the plan and confirmation order in the Chapter

11 case bound the parties to litigate the pre-petition transfer issues in the United States

bankruptcy court.  More specifically, the Second Circuit concluded that nothing in the

plan or confirmation order precluded the banks from challenging the applicability of

United States bankruptcy law to the transfers in question.  The Second Circuit further

found that nothing in the plan or confirmation order had expanded the bankruptcy court's

jurisdiction or purported to give the bankruptcy court exclusive jurisdiction over the

transfer litigation in question.  In short, the Second Circuit found that the plan or

confirmation order were irrelevant to the issue before it.  *See id.* at 1045 (finding that plan

provision regarding jurisdiction was "not relevant.").

Having reached that conclusion, the *Maxwell* court merely noted in dicta that the

bankruptcy administrator's position—that the bankruptcy court was the exclusive forum

for this litigation—was inconsistent with the position that the bankruptcy administrator

took before the bankruptcy court, where it had agreed that Barclay's had reserved its

rights on the issue.  *Id.* at 1045 (citing bankruptcy administrator's counsel's statement

that "[w]ith regard to . . . the Barclays Bank objection to confirmation the provisions of

the Plan in Article 10 . . . were not intended to prejudice the merits of the arguments

presented by Barclays.").  This casual observation aside, nowhere in *Maxwell* did the

Second Circuit decide or even discuss whether a party in bankruptcy generally can rely

on another party's specific objection that was carved out in the confirmation order.[12]

---

[12]        Baeshen's opposition makes reference to the *Maxwell* court's statement that "other banks"—
namely, ones other than Barclay's Bank—were not precluded by challenging whether United States
bankruptcy law applied to the pre-petition transfer litigation.  *See* Memo. of Law in Opp. to Mot. to
Dismiss at 14-15 [ECF No. 100].  But that reference in the Second Circuit's decision is in no way tied to
the dicta about Barclay's objection.  Rather, it appears simply to be a logical outcome of the Second

Permitting the Plaintiffs to proceed with their challenge now despite failing to reserve their rights on this issue would cast a pall over the finality of confirmation proceedings. Confirmation in large Chapter 11 cases is complex, with many multi-lateral negotiations occurring, often right up to the start of the confirmation hearing. Reservations of rights are common and allow specific parties to carve out defined issues for future litigation, if necessary, thus resolving objections that might otherwise bar confirmation. *See, e.g.*, *In re AMR Corp.*, Case No. 11-15463, *Findings of Fact, Conclusions of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Debtors' Fourth Amended Joint Chapter 11 Plan* ¶ 19 (reserving rights of City of Fort Worth and Alliance Airport Authority, Inc. to object to the assumption or assignment of their leases or Debtors' purchase of equipment), ¶ 57 (reserving rights of Clayton Plaintiffs to assert antitrust claims against the Debtors) [ECF No. 10367]. The reasons for such compromises are complex. They inevitably include the monetary value for the estate— and all stakeholders—in achieving confirmation and exiting the costly bankruptcy process. The reasons also include a calculus of whether such issues need to be decided by a court or might otherwise find resolution outside of the courthouse.

In that environment, a bankruptcy court does not—and cannot—conduct an evaluation of the merits for all the issues expressly reserved by the parties. Moreover, it would be impossible to determine how an issue reserved by one party might impact other parties not before the Court and the extent of such impact. Yet, a debtor might have no choice but to tackle such issues at confirmation if reservations were read expansively to

---

Circuit's holding that nothing in the plan or confirmation order precluded a party from challenging the applicability of United States law to these transfers.

cover parties not before the Court. But under those circumstances, it is unclear whether the court would have an actual case and controversy before it. *See U.S. Dep't of Treas. v. Official Committee of Unsecured Creditors*, 475 B.R. 347, 357 (S.D.N.Y. 2012) ("Article III of the United States Constitution limits the jurisdiction of federal courts to 'cases' or 'controversies,' as distinguished from advisory opinions. . . . [I]f there is no case or controversy, the Court lacks subject matter jurisdiction over the action.") (internal citations and quotations omitted). Regardless of whether they are ripe for adjudication, confronting such issues would add immense expense and uncertainty to the confirmation process, resulting in precisely the situation that the doctrine of *res judicata* is designed to avoid. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) (*res judicata* "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication.").

Turning to the fourth and final element of *res judicata*, the Plaintiffs contend their cause of action is not identical to the issues considered in the Plan confirmation proceedings. To determine whether the causes of action are identical, a court will inquire whether "the second action . . . involve[d] the same 'claim' or 'nucleus of operative fact' as the first . . . ." *Celli v. First Nat'l Bank* (*In re Layo*), 460 F.3d 289, 292 (2d Cir. 2006). As an aspect of this element, the bankruptcy court will consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." *Corbett*, 124 F.3d at 88. The critical question for *res judicata* purposes, however, is "whether the party could or should have asserted the claim in the earlier proceeding." *In re Layo*, 460 F.3d at 292 (quoting *In re Howe*, 913 F.2d 1138, 1146 n.28 (5th Cir. 1990)).

For the same reasons discussed above, the Plaintiffs could have raised the issue as part of these bankruptcy cases here—in which the Plaintiffs participated—at any time up to and including the confirmation process.  Taken together, the disclosure statement and the confirmed plan control how the Funds would be handled.  They provided adequate notice that the Funds were considered part of the Debtors' estate property and would be used to pay cash distributions under the Plan and the Reorganized Debtors' operations.  They further provided adequate notice that parties like the Plaintiffs would be given claims in Class 5(a) and 8(a).  The Plaintiffs could have contested all these issues at several points prior to confirmation.  But they did not.  Allowing the Plaintiffs' claims would effectively disrupt the reorganization plan and open the door to numerous other claimants to belatedly make the same challenge.  *See Corbett*, 124 F.3d at 88.

For the reasons discussed above, therefore, the Confirmation Order constitutes a final judgment that precludes the claims the Plaintiffs assert.  As the Debtors have met the four requirements for the application of *res judicata*, the Plaintiffs are precluded from reasserting the same claims.[13]

---

[13]    While the issue was not raised by the parties, the Court notes that the effective date of the Plan occurred on September 17, 2013, thus raising a concern that the issues raised by the Plaintiffs' Complaint are equitably moot.  *See R<2> Invs., LDC v. Charter Communs., Inc. (In re Charter Communs., Inc.)*, 691 F.3d 476, 482 (2d Cir. 2012) ("In this circuit, an appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated.") (citing *Aetna Cas. & Sur. Co. v. LTV Steel Corp. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996)).  Under the doctrine of equitable mootness, "any attempt to revoke the Plan would knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for this Court because of the nature and complexity of the multitude of transactions that have taken place since confirmation . . . ." *Varde Inv. Partners, L.P. v. Comair, Inc. (In re Delta Air Lines, Inc.)*, 386 B.R. 518, 538 (Bankr. S.D.N.Y. 2008).  In fact, equitable mootness has been applied in a variety of contexts in the Second Circuit and elsewhere.  *See In re BGI, Inc.*, --- F.3d ---, 2014 WL 5462477, *4-5 (2d Cir. Oct. 29, 2014) (citing cases).  The Court notes that the Plaintiffs never sought a stay of the confirmation order.  *See id.* at *6 (failure to seek a stay of confirmation supports a finding of equitable mootness).

## CONCLUSION

Because the claims asserted in the Plaintiffs' Complaint are barred by the doctrine

of *res judicata*, the Debtors' Motion to Dismiss is granted.  The Debtors shall settle an

order on three days' notice.

Dated:  November 17, 2014
          New York, New York

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE